G. A. ENOS ET AL., APPELLANTS, V. A. L. HANFF, APPELLEE.

FILED APRIL 16, 1915.   No. 18195.

1. Fraudulent Conveyances: LEASES FOR SALOON PURPOSES. Section 2643, Rev. St. 1913, is not limited to conveyances to defraud creditors. It expressly provides that conveyances made to defraud creditors "or persons" are void. The language is broad enough, in the light of the common law, to include transfers made with the intent and purpose to evade the provision of the "Gibson act" (Laws 1907, ch. 82) forbidding the leasing of a building for saloon purposes by or from manufacturers of liquors.

2. ——: HUSBAND AND WIFE: CORPORATIONS. If a husband, who owns substantially all of the stock in a corporation, procures another corporation to be organized and substantially all of its stock to be issued to his wife, and thereupon the first corporation transfers its property to the new corporation, the transfer is equivalent to the transfer of property directly from husband to wife, within the meaning of section 2643, Rev. St. 1913.

3. ——: CORPORATIONS: DISSOLUTION. If such transfer is made for the purpose of enabling the first corporation, a brewing company, to continue to control buildings for the purpose of leasing them as saloons, the purpose would be illegal, and, if known by the stockholders of the new corporation, such corporation might be dissolved by quo warranto.

4. Statutes: CONSTRUCTION. "Where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise, and by the other of which such questions are avoided, our duty is to adopt the latter." United States v. Delaware & Hudson Co., 213 U. S. 366.

5. ——: ——: CONSTITUTIONAL LAW. While the legislature is not without power to enact a statute in the legitimate exercise of its police power, although it might result in injury to some private interest, it is also undoubtedly true that a statute, the purpose of which was primarily and principally the destruction of property, would violate our fundamental law, and we ought not to assume that in enacting such statute the legislature intended a construction which, although unnecessary to the furtherance of the main purpose of the statute, might result in the arbitrary confiscation of property, if the statute will admit of a more reasonable construction.

6. ——: ——: "GIBSON ACT." The so-called "Gibson act" (Laws 1907, ch. 82) should not be construed so that it might result in the

unnecessary destruction of property values, if it is capable of other construction which would serve the purpose evidently aimed at.

7. ———: ———: FRAUDULENT CONVEYANCES. Questions of fraudulent conveyance of property are generally investigated by courts which are clothed with ample equity powers. They are usually complicated and difficult questions. This statute provides no adequate means of determining such complicated and important and far-reaching questions.

8. Intoxicating Liquors: LICENSE: POWER OF BOARD: FRAUDULENT CONVEYANCES. There is no direct provision in the statute requiring the licensing board to investigate such questions, or to refuse a license because of doubts in regard to the good faith of the title of the apparent owner of the property where the applicant expects to operate his saloon.

9. ———: ———: ———: ———. Under such circumstances, if the legislature had intended that such investigations must be made by this board, and that no license should be issued where the licensing board should find that there was fraud or other infirmity in the title of the party from whom the applicant proposed to lease when that title appeared to be fair and regular upon the record, it seems probable that the legislature would not have left such intention in doubt. It is a more reasonable construction of this statute that the intention was to leave such inquiries to the ordinary process of the law.

10. Municipal Corporations: POWER OF MAYOR: DECIDING VOTE. The mayor of a city of the second class having less than 5,000 inhabitants may cast the deciding vote when the council is equally divided.

11. Intoxicating Liquors: LOCATION OF SALOON: DISCRETION OF BOARD. It is confided to the discretion of the city council to determine the location of a saloon licensed by the council.

12. ———: BOND: REMONSTRANCE: BURDEN OF PROOF. If, upon application for saloon license, the remonstrants allege that the surety company executing the bond tendered was not licensed to do business in this state, or that becoming such surety was not within the powers of such bonding company, the burden is upon them to make such proof.

13. ———: LICENSE: CHARACTER OF APPLICANT: EVIDENCE. The fact that the applicant for license declines to answer incriminating questions is not conclusive that he is not a man of respectable character and standing. The evidence in this case establishes that the applicant is qualified.

14. ———: ———: FORCE OF ORDER. The order of the licensing board granting the license is not an ordinance as defined in section 5227,

Rev. St. 1913. It does not have "the force and effect of law." The provision of section 5237, Rev. St. 1913, that "no ordinance for the government of any city * * * shall go into effect until thirty days after the passage of the same" does not apply.

15. ———: ———: ORDINANCE: INITIATIVE AND REFERENDUM. An ordinance regulating the licensing of the sale of liquors must be enacted before such license can be granted, and the adoption or rejection of such an ordinance is within the initiative and referendum act.

16. Municipal Corporations: INITIATIVE AND REFERENDUM ACT: VALIDITY. The initiative and referendum act of 1897 (Laws 1897, ch. 32) is not invalid as an attempt to regulate the administration of the affairs of cities and other municipalities.

17. Statutes: CONSTRUCTION. If section 10 of the act (Laws 1897, ch. 32) is incapable of a construction in harmony with section 22, art. I of the Constitution, which we do not decide, it may be disregarded without invalidating the whole act.

Rehearing of case reported in 95 Neb. 184. *Former judgment of reversal vacated, and judgment of district court affirmed.*

*Smyth, Smith & Schall* appeared on rehearing as additional counsel, *amici curiæ.*

SEDGWICK, J.

After our former opinion in this case (95 Neb. 184), a reargument was ordered upon the following propositions: First, Who has the burden of proof as to the good faith of the organization of the realty company and Mrs. Storz' ownership of the stock? Second, Is the question involved in this case analogous to a transfer between relatives when creditors are interested? Additional briefs have been presented and argument had upon these propositions both in behalf of the parties themselves and in behalf of the Independent Realty Company. The facts necessary to an understanding of the questions presented are sufficiently stated in our former opinion.

It is suggested that the statute of frauds (Rev. St. 1913, sec. 2643), relates only to transfers to defraud creditors. The statutes of the different states vary considerably in the terms used. They are, of course, suggested by, if not mod-

eled upon, the English statute of 13 Elizabeth, ch. 5. That act made any conveyance of lands or personal property "devised and contrived of malice, fraud, covin, collusion or guile * * * to delay, hinder or defraud creditors and others of their just and lawful actions, suits, debts, accounts, damages, penalties, forfeitures, heriots, mortuaries and reliefs * * * clearly and utterly void, frustrate and of none effect." Some of the statutes of the different states are expressly limited to conveyances to defraud creditors. Others are limited to conveyances to defraud creditors or purchasers. Ours follows more nearly the English act and the statute of New York, which include conveyances to hinder, delay, or defraud creditors or other persons. The words "or persons" are in our statute, so that our statute is not limited to creditors only. The statute, however, "is merely declaratory of the common law. * * * The principles of the common law, as now understood, are so strong against fraud in every shape that they will attain every end proposed by the statute. * * * As the act is merely declaratory, resort may always be had to the principles of the common law whenever the statute fails to reach a case of fraud. * * * The common law supplements the statute, to the end that justice may be done and every species of fraud suppressed." Bump, Fraudulent Conveyances (4th ed.) pp. 8, 9.

The transaction in this case, conveying this property to the corporation and issuing substantially all of the stock in the new corporation to Mrs. Storz when Mr. Storz himself held substantially all of the stock in the other corporation, would be regarded in an action by creditors of Mr. Storz to subject this stock to the payment of his debts as though his stock held in the name of Mr. Storz had been by him transferred to his wife. This precise point was decided by this court in *Lusk v. Riggs*, 65 Neb. 258, 70 Neb. 713. If this transaction was intended to result in delaying creditors of the Storz Brewing Company and Mrs. Storz took the stock with knowledge of that fact, there is of course no doubt that it would be held to be void as against such creditors.

Many decisions of this court are cited as holding that "the rule that the burden of proof is upon the wife to sustain her title where property is transferred to her by her husband applies only where the rights of creditors are affected." The earliest case cited is *German Ins. Co. v. Hyman,* 34 Neb. 704, in which Judge Post states the law correctly as follows: "A gift to a married woman by her husband of money or property is valid except as against the creditors of the latter and those having the equities of creditors." This decision has nothing to do with the above proposition contended for. It decides merely that the property itself passes to the donee, under the conditions named, and that only creditors of the donee and *those having the equities of creditors* can claim the property. It contains no intimation as to who has the burden of proof when it is asserted that the conveyance was made to defeat the established policy of the state. In *Dayton Spice-Mills Co. v. Sloan,* 49 Neb. 622, *Lavigne v. Tobin,* 52 Neb. 686, and *Boldt v. First Nat. Bank,* 59 Neb. 283, the question was whether a gift from husband to wife before he had incurred or contemplated any indebtedness was valid as against claims of creditors for liabilities afterwards incurred. In *Veeder v. McKinley-Lanning Loan & Trust Co.,* 61 Neb. 892, 910, the point involved is stated in the opinion: "If made to defraud the creditors of the grantor, the instrument (deed from husband to wife) would be valid as between the parties, and a court of equity would not lend itself to grant relief to the parties from the consequence of their fraudulent acts. This could only be accomplished by the creditors of the grantor who were such at the time of the making of such fraudulent conveyances." In *Doane v. Dunham,* 64 Neb. 135, and *Van Etten v. Passumpsic Savings Bank,* 79 Neb. 632, it was decided that a deed from husband to wife without consideration will be presumed to be a gift as against the claim of a resulting trust from the grantor to his heirs. The question raised here was not presented or considered in any of these cases.

If the Storz Brewing Company organized or promoted this company and transferred this property for the purpose

of enabling the brewing company to continue to control these properties for the purpose of leasing them as saloons, there can be no doubt that the company so formed would be for an illegal purpose and might be dissolved by *quo warranto*. It is not necessary to consider here what evidence would be necessary in such an action to justify the dissolution of the corporation. The question is whether the Gibson act (Laws 1907, ch. 82) controls the license board and prevents the granting of a license to be used in a building owned by the Independent Realty Company. In *United States v. Delaware & Hudson Co.*, 213 U. S., 366, the supreme court of the United States construed the "commodities clause" of the Hepburn act. The clause provided: "From and after May first, nineteen hundred and eight, it shall be unlawful for any railroad company to transport from any state, territory, or the District of Columbia, or to any foreign country, any article or commodity, other than timber and the manufactured products thereof, manufactured, mined, or produced by it, or under its authority, or which it may own in whole or in part, or in which it may have any interest direct or indirect except such articles or commodities as may be necessary and intended for its use in the conduct of its business as a common carrier." The court, by the present Chief Justice, said: "It is elementary when the constitutionality of a statute is assailed, if the statute be reasonably susceptible of two interpretations, by one of which it would be unconstitutional and by the other valid, it is our plain duty to adopt that construction which will save the statute from constitutional infirmity. *Knights Templars' & Masons' Life Indemnity Co. v. Jarman*, 187 U. S. 197, 205. And unless this rule be considered as meaning that our duty is to first decide that a statute is unconstitutional and then proceed to hold that such ruling was unnecessary because the statute is susceptible of a meaning, which causes it not to be repugnant to the constitution, the rule plainly must mean that where a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which

such questions are avoided, our duty is to adopt the latter." It was contended in that case that "the commodities clause is unconstitutional because its penalties are so prescribed as practically to amount to a denial of an opportunity by railroad companies to obtain a judicial determination of the questions involved," and that "even if abstractly considered, the clause might be embraced within the grant of power to regulate commerce, nevertheless its provisions were in conflict with the due process clause of the fifth amendment to the Constitution, because of the destructive effect which the enforcement of its provisions would produce on the rights of the property which the corporations possessed and had long enjoyed under the sanction of valid state laws." The court quoted from the opinion of the lower court: "The general situation is that for a half century or more it has been the policy of the state of Pennsylvania, as evidenced by her legislative acts, to promote the development of her natural resources, especially as regards coal, by encouraging railroad companies and canal companies to invest their funds in coal lands, so that the product of her mines might be conveniently and profitably conveyed to market in Pennsylvania and other states. Two of the defendant corporations, as appears from their answers, were created by the legislature of Pennsylvania; one of them three-quarters of a century ago and the other half a century ago, for the express purpose that its coal lands might be developed and that coal might be transported to the people of Pennsylvania and other states. It is not questioned that, pursuant to this general policy, investments were made by all the defendant companies in coal lands and mines and in the stock of coal-producing companies, and that coal production was enormously increased and its economies promoted by the facilities of transportation thus brought about. As appears from the answers filed, the entire distribution of anthracite coal in and into the different states of the Union and Canada for the year of 1905 (the last year for which there is authoritative statistics) was 61,410,201 tons; that approximately four-fifths of this entire production of anthracite coal was

transported in interstate commerce over the defendant railroads, from Pennsylvania to markets in other states and Canada, and of this four-fifths, from 70 to 75 per cent. was produced either directly by the defendant companies or through the agency of their subsidiary coal companies. It also appears from the answers filed that enormous sums of money have been expended by these defendants to enable them to mine and prepare their coal and to transport it to any point where there may be a market for it. It is not denied that the situation thus generally described is not a new one, created since the passage of the act in question, but has existed for a long period of years prior thereto, and that the rights and property interests acquired by the said defendants in the premises have been acquired in conformity to the constitution and laws of the state of Pennsylvania, and that their right to enjoyment of the same has never been doubted or questioned by the courts or people of that commonwealth, but has been fully recognized and protected by both."

The court then stated some of the constitutional questions which might arise from the foregoing considerations, and did not find it necessary to determine them. Two of the constitutional questions that necessarily arose from the construction and application of the statute are then stated by the court and thought to be of such importance as to require the court to so construe the statute, if possible, as to avoid such constitutional questions. We think that similar considerations require us to examine the statute in question very closely in ascertaining the intention of the legislature. It will be seen from the facts stated in our former opinion that the question is of far-reaching importance to the Independent Realty Company. These properties in different parts of the state, valued at several hundred thousands of dollars, were, before the enactment of this statute, rented to saloon keepers, and saloons were being operated in them. They were in many instances constructed for that purpose and were not adapted to any other. The statute was in force within 90 days after it was enacted, and imposed very severe penalties upon the

brewing company if it leased these properties for saloon purposes, and also imposed very severe penalties upon the saloon keeper if he leased a building for saloon purposes from the brewing company. It is, of course, true that the legislature is not without power to enact a statute in the legitimate exercise of its police power, although it might result in injury to some private interest; but it is also undoubtedly true that a statute, the purpose of which was primarily and principally the destruction of property, would violate our fundamental law, and we ought not to assume that, in enacting a statute in the legitimate exercise of police power, the legislature has intended a construction which, although unnecessary to the furtherance of the main purpose of the statute, might result in the arbitrary confiscation of property. We ought not, therefore, to give this statute such a construction as might result in the unnecessary destruction of property values, if it is capable of other construction which would serve the purpose evidently aimed at.

Section 5 of the act (Laws 1907, ch. 82) makes it unlawful for any person "to lease, occupy or use ⸱ * * * any building * * * owned or controlled by any * * * corporation * * * engaged in the manufacture" of liquors. The Independent Realty Company was not engaged in the manufacture of liquors. Whatever may have been the motives of those in control of the Storz Brewing Company in organizing the Independent Realty Company and transferring property, it does not necessarily follow that this applicant participated in those motives. He apparently had no means of knowing as to the organization of these companies and what the motives of their promoters may have been. Questions of fraudulent conveyance of property are generally investigated by courts which are clothed with ample equity powers. They are usually complicated and difficult questions. The construction of the statute contended for by the remonstrants would imply that the legislature intended that the applicant for saloon license must determine the question of the good faith of the organizers of these companies at his peril, and, if he made a

mistake in that regard, would subject himself to a penalty of from $1,000 to $10,000. This statute provides no adequate means of determining such complicated and important and far-reaching questions. The licensing board is an administrative body. Their hearings are informal. They are not supposed to be familiar with legal proceedings or the rules of evidence. Their investigation of such questions must necessarily be inadequate and superficial. If they admit incompetent evidence, it may be disregarded upon appeal, but their rulings upon the exclusion of evidence are final; no further evidence is taken by the court upon appeal. The district court determines the matter upon the record made and the evidence taken by the licensing board, and, when the case comes to this court, we are likewise limited. Such an investigation is generally imperfect and incomplete. The court not having all of the facts before it, it would be unable to determine the truth of the matter, and its conclusion might be unjust. There is no direct provision in the statute requiring the licensing board to investigate such questions, or to refuse a license because of doubts in regard to the good faith of the title of the apparent owner of the property where the applicant expects to operate his saloon. Under such circumstances, if the legislature had intended that such investigations must be made by this board, and that no license should be issued where the licensing board should find that there was fraud or other infirmity in the title of the party from whom the applicant proposed to lease when that title appeared to be fair and regular upon the record, it seems probable that the legislature would not have left such intention in doubt. We think that it is a more reasonable construction of this statute that the intention was to leave such inquiries to the ordinary process of the law. The licensing board may exercise its discretion, and is not required to grant a license if a doubt is entertained as to the good faith in the proceedings in any respect. On the other hand, it seems clear that the legislature never intended that the licensing board should be compelled to enter upon such investigations as are suggested by this objection.

Having reached the conclusion that the judgment of the district court ought not to be reversed for the reason formerly given, we proceed to an examination of the other grounds urged for reversal. It is objected that the mayor did not possess power to cast the deciding vote when the council was equally divided, and therefore no license has been legally granted to defendant. *Rohrer v. Hastings Brewing Co.*, 83 Neb. 111, is conclusive against remonstrants upon this point. It also disposes of assignment No. 2.

The objection that the "location of this saloon building in the city of Stanton in itself was such as, considered with reference to the business, constituted a business nuisance" is answered in *Fraser v. Hunter*, 96 Neb. 134, where it was held: "The determination of the locality in which a saloon may be conducted is one which is committed to .the good judgment of the licensing body, and not to the discretion of the courts."

It is objected that "no proper liquor bond appears to have been offered to and approved by the mayor and council." It will be seen that the objection is not that no liquor bond was offered and approved, but that no "proper" bond was offered. It is conceded that a bond was tendered, signed by the American Surety Company, and the real contention seems to be: First, that the applicant did not furnish proof that executing saloon keepers' bonds was within the powers conferred upon the company by its charter; and, second, that it is not shown that the surety company is authorized to do business in the state of Nebraska. In *Lambert v. Stevens*, 29 Neb. 283, 287, it was said: "When the remonstrance denies any matter necessary to confer jurisdiction upon the granting power, as that certain signers to the petition are freeholders, the burden is on the applicant to establish that they are qualified petitioners. Where the remonstrance sets up new matter, such as that certain signers to the petition were made freeholders for the purpose of signing the same, or that the applicant has been guilty of a violation of any provisions of the liquor law within a year, or that any former license

has been revoked, the burden is upon the remonstrators to establish such new matter." It follows that the burden was upon the remonstrants to establish the facts which they now urge for the rejection of this bond.

The applicant was questioned in regard to violation of the law by him and declined to answer. It is argued from this that he has conceded that he was not a man of good moral character, but this conclusion does not follow. The evidence shows that the applicant had never engaged in the saloon business prior to the time of making this application; that he was 59 years old, was a retired farmer, had resided in Stanton county since 1874, and had held the offices of precinct assessor and county assessor of Stanton county. At the hearing he introduced as witnesses the county judge of the county, who had known him since 1906, Chris Selle, who had known him for 40 years, and H. D. Miller, vice-president of the First National Bank of Stanton, who had known him for 20 years, all of whom testified as to his good character and standing in the community. It is clear that this assignment is without merit. *Shank v. Lee,* 90 Neb. 732; *In re Phillips,* 93 Neb. 152.

It is urged that, assuming that ordinance No. 94 and the law of 1897, under which it was passed, are valid and all proceedings of the mayor and council "up to and including the adoption of the order granting license in this case, still, under the plain provision of the 'Act of 1897,' the action of the council directing that the license issue and the action of the district court directing that the license issue 'forthwith' were both premature and erroneous." The order of the licensing board granting the license is not an ordinance as defined in sec. 5227, Rev. St. 1913. It does not have "the force and effect of law." The provision of section 5237, Rev. St. 1913, that "no ordinance for the government of any city * * * shall go into effect until thirty days after the passage of the same" does not apply. An ordinance regulating the licensing of the sale of liquors must be enacted before such license can be granted, and the adoption or rejection of such an ordinance is within the initiative and referendum act.

Enos v. Hanff.

The initiative and referendum act of 1897 is not invalid as an attempt to regulate the administration of the affairs of cities and other municipalities. It provides for the reference to the voters of such measures as the legislative authorities of such municipalities have power to "give the force and effect of law." It does not violate section 11, art. III of the Constitution, nor that provision of the federal Constitution that guarantees to the people representative form of government.

If section 10 of the act (Laws 1897, ch. 32) is incapable of a construction in harmony with section 22, art I of the Constitution, which we do not decide, it may be disregarded without invalidating the whole act.

Our former judgment is vacated, and the judgment of the district court is

AFFIRMED.

BARNES, J.; concurring.

It is stated in the majority opinion, in substance, that we ought not to assume that, in enacting the so-called Gibson act, the legislature intended that it should be so construed as to result in the confiscation of the vast amount of property which at one time was owned by the brewing company, if such construction can reasonably be avoided. As I understand the question, such would be the effect of the act if we should hold that the licensing board had the power and was required to determine the rights of the Independent Realty Company to own, hold and control such real estate. This question is a judicial one, and should be determined by a court of equity in a case brought directly for that purpose, and in which the Independent Realty Company is a party. This question should not be decided by an administrative body, such as a city council or village board. It is shown by the record that the title to the realty once owned by the Storz Brewing Company is now of record in the Independent Realty Company. It is regular and fair upon its face. Its title has not been assailed by the state in any proceeding in a court having jurisdiction to determine the *bona fides* of its title. As I under-

98Neb.17

stand the question, the title of the realty company should not be determined by an administrative body upon the mere suggestion that the property still belongs to the brewing company. This question cannot properly be disposed of by saying that the statute is so plain that a village board or city council is bound to refuse a license to sell malt, spirituous or vinous liquors to an applicant, upon the suggestion that the building in which the applicant proposes to conduct his business is owned and controlled by a brewing company, in a proceeding to which the owner of the title is not a party. It is not a proper disposition of this far-reaching and important question to say that the statute is too plain for misinterpretation or misconstruction. The question should be determined in an action for that purpose, brought in a court competent to determine it, and its judgment should be such that a licensing board would have no difficulty in following the rule announced by the court. Otherwise we might have the good faith of the Independent Realty Company's title upheld in one village and denied in others.

I therefore concur in the majority opinion.

ROSE, J., dissenting.

The controlling question presented by the record is very simple, and its proper solution is free from difficulty. Can a village board issue a valid license authorizing the sale of intoxicating liquors in a building controlled by a manufacturer of beer? The statute says, "No," in language too plain for misinterpretation or misconstruction. Rev. St. 1913, sec. 3892. The power of the legislature to pass such a law and to make it applicable to present owners of property devoted to saloon purposes has been affirmed by the supreme court of the United States as follows: "Lawful state legislation, in the exercise of the police powers of the state, to prohibit the manufacture and sale within the state of spirituous, malt, vinous, fermented, or other intoxicating liquors, to be used as a beverage, may be enforced against persons who, at the time, happen to own property whose chief value consists in its fitness for such

manufacturing purposes, without compensating them for the diminution in its value resulting from such prohibitory enactments." *Mugler v. Kansas,* 123 U. S. 623.

The arm of sovereignty created by law to withhold from an applicant a license to sell intoxicating liquors in a building controlled by a manufacturer of beer is the licensing board.   Contrary to the pronouncement of the majority, the legislature has in unmistakable terms clothed that board with the machinery and the power to investigate and determine whether a proposed site for a saloon is owned or controlled by a brewer.   If the licensing board makes a mistake in exercising such authority, the courts may correct it by means of an appeal.   Rev. St. 1913, ch. 40.   In the present case, under rules of evidence recognized by the courts of Christendom, it is shown that the licensing board, in violation of law, granted an illegal license to conduct a saloon in a building controlled by a manufacturer of beer. The legislature had power to authorize the licensing board to investigate and determine the ownership or control of a building for the purpose of granting or refusing a saloon-keeper's license.   In passing upon the sufficiency of a petition for a license to sell intoxicating liquors, the licensing boards, under legislative power recognized by this court, have, for many years, investigated and passed upon the petitioner's title to real estate.   Administrative bodies like the county board, the state board of irrigation and the state railway commission are now performing duties which affect property rights.   The former judgment pronounced by this court would enforce the statute as written.   The evidence is correctly stated and the law is properly applied in the first opinion.   The license was canceled according to both the spirit and the letter of the statute.   *Enos v. Hanff,* 95 Neb. 184.   For these reasons, I adhere to the former decision, and dissent from that of the majority.

LETTON. J., concurs in this dissent.